In re R & H INVESTMENT CO., INC., Debtor.

PENINSULA FEDERAL SAVINGS AND LOAN ASSOCIATION, Movant,

v.

R & H INVESTMENT CO., INC., Respondent.

Bankruptcy No. 5–84–00319.
Motion No. 5–84–0286–M

United States Bankruptcy Court, D. Connecticut.

Jan. 31, 1985.

Robert F. O'Malley, Jr., Smathers & Thompson, Miami, Fla., J. Casey Healy, Gregory & Adams, Wilton, Conn., for movant.

Robert A. Greenspon, Stephen E. Goldman, Robinson & Cole, Hartford, Conn., for Carroll G. Moore, trustee of the Estate of Vincent Roggio.

## MEMORANDUM AND ORDER ON MOTION FOR RELIEF FROM STAY

ALAN H.W. SHIFF, Bankruptcy Judge.

The movant, Peninsula Federal Savings and Loan Association (Peninsula), the first mortgagee on the only assets of the R & H Investment Co., Inc. (debtor), seeks relief from the automatic stay provided by Code § 362(a) in order to sell that property pursuant to a judgment of foreclosure rendered by the Circuit Court of the Eleventh Judicial Court of Florida approximately two months before the Chapter 11 petition was filed in this case.

1. The ground lease which is fully assignable is not at issue here. Peninsula's Exhibit 2. The land upon which the garage was constructed is owned by the debtor in fee.

2. Case No. 5–84–00171, filed on March 16, 1984.

## BACKGROUND

The assets are an office building and adjacent parking garage located in Miami, Florida. The first two stories of the building were constructed in 1956 and ten additional stories were constructed in 1969. The five level garage was constructed in 1945. The debtor purchased the building, garage, and an assignment of the ground lease for the real property upon which the building was constructed[1] from Peninsula in March 1982. The validity and priority of Peninsula's mortgages, which involve all of the property sold by Peninsula to the debtor, were not contested, nor was the amount of the debt they secure. The building continues to be known as the Peninsula Federal Building.

Ninety-seven percent of the outstanding stock of the debtor is property of the Vincent Roggio bankruptcy estate which is also pending in this court.[2] Carroll G. Moore, the trustee of the Roggio estate, filed the voluntary Chapter 11 petition which commenced the bankruptcy case underlying this proceeding.[3] It is apparent from the evidence in this proceeding that the debtor has no intention of reorganizing. Indeed, Moore testified that he was opposed to the relief sought by Peninsula because he intended to sell the property of this estate in order to fund the Roggio estate.[4]

## DISCUSSION

Peninsula has requested relief from the automatic stay pursuant to Code § 362(d) which provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

3. The petition was filed on May 2, 1984, seven days before the sale date set by the Florida Circuit Court in accordance with the Peninsula judgment of foreclosure.

4. Testimony of Carroll G. Moore, December 8, 1984. (Transcript unavailable)

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Peninsula has shown that a judgment of foreclosure was rendered by a Circuit Court of the State of Florida on March 9, 1984 for nonpayment of the mortgage debt, and the debtor does not contest the fact that no payments have been made toward the debt since that time. Thus, the debtor, as the party opposing Peninsula's motion, has the burden of proving that the relief sought by Peninsula should be denied, Code § 362(g)(2). In order to sustain that burden the debtor asserts that Peninsula's interest in the property is adequately protected by an equity cushion.

The existence of an equity cushion has been called "the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court." *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984). In *In re Roane*, 8 B.R. 997 (Bankr.E.D.Pa.1981) the court held:

Adequate protection may be provided by an equity cushion—that is, by proof that there is value in the property above the amount owed to the mortgagee that will shield the mortgagee's interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect.

*Id.* at 1000.

When a debtor relies solely on the existence of an equity cushion to provide adequate protection to a secured creditor, the debtor assumes a heavy burden to overcome the creditor's assertion that the se-

cured interest is at risk. *In re Barilliao*, Adv. No. 2–81–0797 (Bankr.D.Conn. April 19, 1982). *See also Matter of Melson*, 44 B.R. 454, 452 (Bankr.D.Del.1984) ("An equity cushion provides adequate protection if the equity is not eroding so rapidly that it is illusory"). In this proceeding the debtor's burden is to show not only that the market value of the property, less costs of sale and tax encumbrances,[5] is greater than the steadily increasing amount of Peninsula's debt; but also that it is greater by a margin sufficient to ensure that Peninsula's interest is not at risk.[6]

Evidence introduced by both parties in support of their claims as to the market value of the subject party consisted of testimony and documents concerning a variety of sub-issues, including occupancy rates, rental rates, interest rates, tax rates, the condition of the property, and market conditions in the downtown Miami area for sales and leases. The problem of determining the value of property which is essentially unique is not a new one:

As one court noted in discussing the many variables that can influence the determination of equity, "[w]e deal here in likelihoods and probabilities," not "exactitude." In determining fair market value, "the court can only endeavor to make a reasonable estimate of value based upon expert testimony presented to it in court." (citations omitted)

*In re Kertennis*, 40 B.R. 895, 897 (Bankr. D.R.I.1984).

The appraisal offered by the debtor was prepared by Leonard Bisz for Peninsula before the 1982 sale of the property to the debtor. The Bisz appraisal estimated the value at $19,500,000.00.[7] At Peninsula's request Bisz prepared an update valuation report on the same property on or about March 6, 1984, which showed no change in

---

5. *See In re Toto,* 29 B.R. 947 (Bankr.E.D.Pa. 1983); *In re Pitts,* 2 B.R. 476 (Bankr.C.D.Cal. 1979).

6. The accrued debt as reflected in the judgment of March 9, 1984 was $15,914,788.94. Interest

accrues on the judgment amount at the statutory rate of eight percent per annum or $5,232.26 per day.

7. Debtor's Exhibit M.

the value.[8] However, at his October 2, 1984 deposition, Bisz,[9] testified that his $19,500,000.00 valuation was no longer accurate because of a decreased demand for office space in downtown Miami since March 1984.[10]

The appraisal offered by Peninsula was prepared for Citibank in January–February, 1984 by Robert Stone who estimated the fair market value of the subject property at $18,500,000.00. Stone's appraisal was based upon a capitalization rate of 9%.[11] However, expert testimony revealed that not only does the market value of property rise as the capitalization rate falls,[12] but also that capitalization rates fall with interest rates[13] and that the prime rate had fallen since Stone completed his appraisal.[14]

A valuation of $21,000,000.00 was offered by Richard Langhorne, an officer of the real estate company which is presently attempting to sell the property for the debtor. The Langhorne opinion, however, was not based on any appraisal or valuation of the property, but is in fact the amount agreed upon by his real estate company and the Roggio trustee as a listing price. The Langhorne opinion is therefore of minimal probative value.

The expert testimony of the professional appraisers produced market values which were similar considering the sums involved. Taking into account that both appraisals were completed by early March 1984, that major repairs to the building have since become necessary,[15] that the Bisz appraisal should be adjusted downward to take into account his opinion regarding changes in the real estate market and the Stone appraisal should be adjusted upward to account for the decline in interest rates, I find the fair market value of the subject property is $18,900,000.00.

The principal and interest of the Peninsula debt totals $17,468,770.17 as of December 31, 1984.[16] To that amount, Peninsula is entitled to add reasonable attorney's fee and costs, which I find to be $50,000.00 and $12,388.05 respectively;[17] estimated costs of sale in the amount of $570,000.00, representing a brokerage commission,[18] and tax

---

8. Debtor's Exhibit N. The March 6, 1984 valuation shows a value of $20,000,000.00 for the land and improvements, but later testimony showed that Mr. Bisz had not subtracted the value he allotted to the leasehold ($500,000.00) from that amount and the value of the property available for sale would in fact be $19,500,000.00. Deposition of Leonard Bisz, October 2, 1984, p. 36.

9. Selected passages of the deposition were read into the record in this proceeding on December 7, 1984. (Transcript unavailable)

10. Deposition of Leonard Bisz, October 2, 1984, p. 55.

11. The capitalization rate is used to relate investment to future income to calculate value under the "income approach," one of the three methods of appraising real estate. See Black's Law Dictionary, p. 191 (5th Ed.1979).

12. Testimony of Robert Stone, transcript of October 10, 1984, pp. 15–16.

13. Id. at p. 17.

14. Testimony of Richard Langhorne citing rates of Southeast Bank, transcript of October 10, 1984, p. 72.

15. Deposition testimony of Paul White, taken September 17, 1984 and read into the record of this proceeding. Transcript of November 2, 1984, p. 92.

16. The amounts were undisputed. See post trial briefs.

17. Peninsula offered statements prepared by its attorneys, Peninsula's Exhibits 20 and 21, showing a sum of $95,248.64 outstanding for services rendered since the foreclosure judgment was rendered. Peninsula's attorney, Robert F. O'Malley, Jr., testified as to the nature and extent of the services rendered. Upon cross examination, Mr. O'Malley asserted the attorney-client privilege on behalf of his client and refused to answer questions regarding confidential communications between Smathers & Thompson and Peninsula. An evidentiary ruling on December 7, 1984 stated that Mr. O'Malley would not be compelled to testify, but that all services about which he refused to testify would be excluded from consideration by this court. (Transcript unavailable)

18. The debtor was authorized to enter into an exclusive listing agreement with the Allen Morris Company by an October 2, 1984 order of this court. The agreement specifies that 3% of the gross sales price, if less than $22,000,000.00, is

liens totalling $444,069.25. As a further adjustment, $454,136.39, held as rental income from the building,[19] should be added to the fair market value of the subject property. By deducting Peninsula's total claim in the adjusted amount of $18,545,-227.47 from $19,354,136.39, the adjusted value of the property, an equity cushion of $808,908.92 is computed. At that level, the equity cushion calculates to 4.3% of the fair market value of the property.

■ In assessing whether an equity cushion is sufficient to provide a secured creditor with adequate protection, courts must be mindful that a surplus of value over debt is inadequate unless there is enough equity to protect the creditor during the time it is likely to take the creditor to obtain full satisfaction of its allowable claim.[20]

■ In this case where no payments are being made by the debtor while interest continues to accrue, an equity cushion of 4.3% is inadequate. *In re Hagendorfer*, 42 B.R. 17 (S.D.Ala.1984), *aff'g* 42 B.R. 13 (Bankr.S.D.Ala.1984); *Matter of Schaller*, 27 B.R. 959 (W.D.Wisc.1983); *In re The Trident Corporation*, 22 B.R. 491 (E.D.Pa. 1982) *aff'g*, 19 B.R. 956 (Bankr.E.D.Pa. 1982); *In re A & A Construction Co., Inc.*, 31 B.R. 81 (Bankr.D.Va.1983); *In re Gaslight Village, Inc.*, 8 B.R. 866 (Bankr.D. Conn.1981); *In re Tucker*, 5 B.R. 180 (Bankr.S.D.N.Y.1980). *See In re 5-Leaf Clover Corp.*, 6 B.R. 463, 467 (Bankr.D.W. Va.1980) ("To require the creditor to wait until the collateral's value equals the lien attaching it ... does not adequately assure

the creditor that the debt can be fully covered.").

As the court noted in *Gaslight Village*, The automatic stay under § 362 was not intended to be used as a weapon or club to reduce secured creditors into submission with the continued passage of time while no payments are made to them. The automatic stay was only intended to give the debtor a breathing spell from his creditors to afford him reasonable time to come up with a repayment or reorganization plan while relieved of the financial pressures that drove him to petition for relief.

8 B.R. at 870, *citing* House Report No. 95–595, 95th Cong., 1st Sess. (1977) 340–2; Senate Report No. 95–989, 95th Cong. 2d Sess. (1978) 49–51, U.S. Code Cong. & Admin. News 1978, p. 5787.

Beyond the considerations attendant upon an analysis and application of Code § 362, this court cannot overlook equitable considerations which color the background of this proceeding. *See In re El Patio, Ltd.*, 6 B.R. 518, 523 (Bankr.C.D.Cal.1980). Here equity runs strongly in favor of Peninsula. Peninsula has been penalized by its diligence in obtaining a foreclosure judgment which resulted in a reduction in the applicable interest rate from 13.4%, which it had bargained for,[21] to the 8% statutory rate. To frustrate Peninsula's effort to complete a sale of the property ordered by a Florida court more than ten months ago on the chance that the debtor might be able to sell the property for a higher price is not justified in light of the extremely thin equity cushion in this case.[22] Indeed it is highly unlikely that investors with enough sophistication to purchase the

---

to be paid as a sales commission to the Allen Morris Company, out of the proceeds of the sale.

**19.** This sum was also undisputed. *See* post trial briefs.

**20.** This court notes that while Peninsula was granted a judgment of foreclosure in March 9, 1984, the sale, which was not held because of this bankruptcy case, was scheduled for May 9, 1984.

**21.** Peninsula's Exhibit 3.

**22.** The court in *In re Philadelphia Consumer Discount Co.*, 37 B.R. 946 (E.D.Pa.1984) *aff'g.* 32 B.R. 322 (Bankr.E.D.Pa.1983) noted:

[T]he conclusion is inescapable that the debtors have used the device of Chapter 11 merely to delay [the secured creditor's] foreclosure proceedings. This fact weighs against the relief the debtors request.

*Id.* at 952, *citing In re Pelzer*, 15 B.R. 73, 74–5 (Bankr.E.D.Pa.1981).

type of property under consideration here are not aware of this bankruptcy proceeding.

Having determined that Peninsula is entitled to relief from the automatic stay, it is unnecessary to discuss Code § 362(d)(2) or the cash collateral claims additionally asserted by Peninsula.

### ORDER

For the foregoing reasons it is ordered that Peninsula is granted relief from the automatic stay under Code § 362(d)(1) so that it may continue with its foreclosure action against the debtor in Florida and proceed with the foreclosure sale of the subject property.