**In re PARK WEST HOTEL CORP.**
**d/b/a Park West Hotel &**
**Club Debtor.**

**Bankruptcy No. 86–11095–JG.**

United States Bankruptcy Court,
D. Massachusetts.

Oct. 2, 1986.

Mark N. Polebaum, Hale & Dorr, Boston, Mass., for debtor.

Whitton E. Norris, III, Peabody & Brown, Boston, Mass., for movant.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

The matter before the Court is the Motion for Dismissal of Chapter 11 Petition or, in the Alternative, for Relief from Stay filed by Yankee Bank for Finance & Savings, FSB ("Yankee Bank") on August 1, 1986. Park West Hotel Corp. (the "Debtor") filed an objection to the motion on August 6, 1986. Yankee Bank subsequently filed, on August 15, 1986, a Motion for Reconsideration of Order Denying Motion to Dismiss and Request for Immediate Relief from the Automatic Stay. The Debtor opposed that motion in a pleading filed on August 22, 1986. Hearings were held on the various motions and objections on August 7, 1986 and on September 3, 1986. Ruling from the bench on August 7, 1986, the Court denied Yankee's Motion to Dismiss, without prejudice, and ordered the Debtor to file a report with the Court by August 21, 1986 regarding its efforts to obtain refinancing. The Court then continued the hearing until September 3, 1986. The original motion and the Motion for Reconsideration were taken under advisement on that date.

## BACKGROUND

The Debtor is a Massachusetts corporation, incorporated in 1984. It is in the business of "operating" an unfinished, 208 room hotel called the Park West Hotel & Club (the "Hotel"), located at 75 Felton Street, at the intersection of Interstate 495 and Route 20, in Marlborough, Massachusetts. The Debtor is owned and controlled by an individual named Eino Keerd ("Keerd").

Cloverleaf Realty Trust ("Cloverleaf"), a nominee trust established by declaration of trust dated January 2, 1982, holds record title to the Hotel. Keerd is the trustee of Cloverleaf and, until July 30, 1986, was one of its beneficiaries. On that date, the owners of the beneficial interests in Cloverleaf conveyed their interests to the Debtor. One day later, at 9:30 a.m., the Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. The Debtor's filing of its bankruptcy petition forestalled a foreclosure sale scheduled by Yankee Bank for July 31, 1986 at 11:00 a.m.

By way of background, Yankee Bank, on or about December 11, 1984, entered into a construction loan agreement with Cloverleaf pursuant to which Yankee Bank agreed to lend Cloverleaf a maximum amount of $10,500,000. At the same time, Cloverleaf executed a mortgage note in favor of Yankee Bank in the principal amount of $10,500,000 and granted Yankee Bank a mortgage, which was duly recorded. Cloverleaf, through its trustee, Keerd, also executed a security agreement on December 11, 1984. Keerd, individually, executed a guaranty of Cloverleaf's obligations as well. The loan agreement provided for a completion date for construction of September 1, 1985.

The mortgage note provided that interest would be payable monthly commencing January 1, 1985, with principal to be repaid beginning January 1, 1986. By the terms of the note, interest was to accrue at a minimum rate of 15% per annum. Upon default, the interest rate was to increase by 4%, and, at maturity, interest was to accrue at not less than 20%.

Construction of the Hotel commenced in early 1985 but was interrupted in June of that year when the general contractor, Tocci Corporation ("Tocci"), was terminated as a result of a dispute with Cloverleaf and/or VEK Corporation, another entity owned and controlled by Keerd. As a consequence, Cloverleaf was unable to meet the scheduled completion date, although work continued on the Hotel project through the summer with VEK Corporation replacing Tocci as the general contractor. Because of Cloverleaf's failure to meet the completion deadline, Yankee Bank refused to release approximately $700,000 in loan proceeds held as a retainage under the construction loan agreement.

On September 25, 1985, Yankee Bank and Cloverleaf entered into a letter agreement pursuant to which Cloverleaf acknowledged it was in default under various provisions of the construction loan agreement. Notwithstanding Cloverleaf's default, however, Yankee Bank agreed to advance the remaining balance of the loan proceeds to Cloverleaf and to forebear from instituting foreclosure proceedings until October 31, 1985. In the meantime, Cloverleaf, through Keerd, endeavored to refinance or to sell the Hotel. Upon the passing of the October 31st deadline, Yankee Bank, on November 6, 1985, demanded payment of the entire unpaid principal amount due from Cloverleaf and instituted foreclosure proceedings.

On or about February 10, 1986, a single involuntary petition was filed against Cloverleaf, VEK Corporation and Keerd. Fifteen days later, Yankee Bank filed a Motion for Relief from Stay. Subsequently, Cloverleaf was deleted from the involuntary petition and a separate petition was filed against VEK Corporation. Additionally, the Court ruled that Yankee Bank was enjoined from foreclosing on the Hotel property by virtue of Keerd's beneficial interest in Cloverleaf.

The involuntary petition filed against Keerd generated protracted litigation. Keerd simultaneously pressed his Motion to Dismiss Involuntary Petition and vigorously defended against Yankee Bank's Motion for Relief from Stay. Yankee Bank and Keerd introduced extensive testimony and documentary evidence over a three month period on the issue of whether Yankee Bank was entitled to relief from stay. Likewise, Keerd and the petitioning creditors introduced extensive testimony and documentary evidence on the issues of whether the claims held by the petitioning creditors were contingent as to liability or the subject of bona fide disputes. *Cf.* 11 U.S.C. § 303(b)(1).

Keerd adopted the position that his personal assets should not be available to satisfy his creditors or those of Cloverleaf and VEK Corporation, while at the same time availing himself of the protection afforded by section 362, in effect, "having it both ways." At the conclusion of the hearings on Yankee Bank's motion, the Court took the matter under advisement and instructed the parties to submit memoranda summarizing the evidence and arguments of counsel. However, prior to rendering a

decision, the Court dismissed the involuntary petition against Keerd. Approximately two months later, the Debtor filed its voluntary petition. In a document filed with its voluntary petition, the Debtor, in a document captioned "Statement of the Debtor," made the following representation to the Court:

The Debtor anticipates that Yankee Bank will file, *inter alia*, a motion seeking relief from the automatic stay of 11 U.S.C. § 362 with this Court. So as not to burden this Court's docket and so as not to unfairly prejudice the rights of Yankee Bank, the Debtor consents to submission of any motion by the Bank for relief from the automatic stay on the hearings and pleadings filed in the Chapter 7 case of Eino Keerd, Case No. 86–10158–JNG.

Yankee Bank has represented to the Court that it has no objection to the Debtor's position. Thus, the parties and the Court are in agreement that, in the interest of judicial economy, the testimony and documentary evidence introduced in the Keerd case may be considered by the Court in its determination of Yankee Bank's pending motions.

## DISCUSSION

Section 362(d) of the Bankruptcy Code provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of any act against property under subsection (a) of this section, if—

(A) the debtor does not have any equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d). In conjunction with section 362(d), section 362(g) provides:

In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C. § 362(g).

Yankee Bank maintains that, as of August 15, 1986, it was owed $12,171,120.54. That figure is an extrapolation of the figures submitted in Exhibit 18, an exhibit introduced into evidence in the prior, four day trial on Yankee Bank's entitlement to relief from stay. In that exhibit, interest was calculated at 19% from November 1, 1985 through November 6, 1985 and at 20% from November 7, 1985 through June 7, 1986. The per diem rate is calculated to be $5,833.19. Using that rate, the Court observes that as of September 26, 1986 the Bank is owed $12,417,114.52, exclusive of costs and attorneys fees—costs and fees which are unlikely to be inconsequential.[1]

The Debtor and Keerd dispute the Bank's application of the default and maturity rates of interest. They contend that the contract rate of interest should be applied. Nevertheless, they agree that interest accrues at a rate of at least $130,000 per month. Thus, according to the Debtor and Keerd, the amount owed to the Bank as of August 15, 1986 was approximately $11,750,000. For purposes of the Court's decision, the default and maturity rates of interests will be considered in determining

---

1. Under section 506(b) of the Bankruptcy Code, oversecured creditors are allowed to claim "interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). However, section 506(b) is a timing provision which allows postpetition interest only if the creditor is oversecured after the trustee has been compensated for the expenses categorized in section 506(c). *See generally* O'Toole, *Adequate Protection and Postpetition Interest in Chapter 11 Proceedings,* 56 Am.Bankr. L.J. 251 (1982).

the amount owed to Yankee Bank, as those rates are clearly set forth in the mortgage note.

In addition to the sums owed Yankee Bank as first mortgagee, the Debtor admits that there are at least ten other creditors with attachments or liens on the real property, most notably Tocci which has a mechanics lien in the amount of approximately $2,800,000 sandwiched between the first $7 million advanced by Yankee Bank and the remaining $3.5 million advanced. Thus, at a bare minimum, the Hotel property is incumbered in the amount of approximately $15.2 million.

Accordingly, Yankee Bank argues that it is entitled to relief from stay for the reasons outlined in section 362(d), i.e., its interest in the Hotel property is not adequately protected, the Debtor has no equity in the Hotel property and the property is not necessary to an effective reorganization. Specifically, it states that it has received no payments on its mortgage loan for almost one year and that the Debtor has no substantive business operation, no stream of income and no commitment for financing or for a sale which would satisfy the indebtedness due Yankee Bank or permit the Debtor to propose a plan of reorganization with any likelihood of confirmation. Although the Debtor maintains it has a letter of intent from a prospective buyer, there is no dispute that Yankee Bank has not received any payments for a protracted period of time and that the Debtor is able to function only through cash infusions from Keerd. Thus, in its present mode of "operations," the Debtor incurs expenses for employee wages, real estate taxes, insurance, utilities and maintenance without any apparent means of paying for them, other than through Keerd. Yankee Bank, not surprisingly, suggests that the Debtor's undercapitalization jeopardizes the present value of the Hotel for its benefit and that of junior creditors.

The Debtor opposes Yankee Bank's Motion for Relief from Stay on the grounds that the value of the Hotel exceeds the debt owed to Yankee Bank by approximately $4,900,000 and that such excess value adequately protects Yankee Bank. With respect to the question of adequate protection, at the September 3, 1986 hearing, counsel to the Debtor advised the Court that the Debtor was not in a position to make cash payments to Yankee Bank as a means of providing adequate protection. In short, the Debtor relied on (and continues to rely on) its equity cushion to meet its burden of proving that Yankee Bank is adequately protected.

Derived from the fifth amendment protection of property interest, adequate protection, which is not defined in the Bankruptcy Code, *In re Briggs Transportation Co.,* 780 F.2d 1339, 1344 (8th Cir.1985); *In re Jug End in the Berkshires, Inc.,* 46 B.R. 892, 900 (Bankr.D.Mass.1985), constitutes a legislative attempt to reconcile the competing interests of debtors, who need freedom from harassing creditors in order to effectuate reorganizations, and secured creditors, who are entitled to some measure of protection for their bargained for property interest. Section 361 of the Bankruptcy Code lists three non-exclusive ways adequate protection may be provided.[2] A recent Fifth Circuit opinion suggests that the method of cash payments outlined in section 361(1) "would seem to be particular-

---

2. Section 361 provides that adequate protection may be provided by—

  (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

  (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

  (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

ly appropriate when collateral is depreciating at a steady rate." *In re Timbers of Inwood Forest Associates, Ltd.,* 793 F.2d 1380, 1388 (5th Cir.1986). According to that court, section 361(2) "would appear to protect a secured creditor when a debtor proposes to use cash collateral or may consume other collateral at an uneven rate, such as inventory." *Id,* at 1388. The Court of Appeals for the Fifth Circuit then noted that section 361(3) is a catch-all provision that raises a difficult issue of congressional intent since that subsection does not state what interest is to be protected during the automatic stay. The court concluded that as a result of the "indubital equivalent" language used in section 361(3) that section is "not only ambiguous on its face but also when considered in light of the interest provisions in the Code."[3] *Id.* at 1389. The court, thereupon undertook an exhaustive review of the legislative history and applicable Code sections to clarify the meaning of section 361. Despite the perceived ambiguity of section 361, courts are in agreement that what constitutes adequate protection is a factual question to be determined by the bankruptcy judge and is subject to a clearly erroneous standard of review. *In re Peach State Distributing Co.,* 58 B.R. 873, 875 (Bankr.N.D.Ga.1986).

Courts have held that, standing alone, an equity cushion, defined as "the value in the property above the amount owed to the creditor with a secured claim that will protect that creditor's secured interest from decreasing in value during the period that the automatic stay remains in effect," *In re Jug End in the Berkshires, Inc.,* 46 B.R. 892, 899 (Bankr.D.Mass.1985); *see also In re R & H Investment Co., Inc.,* 46 B.R. 114, 116 (Bankr.D.Conn.1985), can provide adequate protection and may even provide sufficient protection in the absence of any mortgage provide sufficient protection in

the absence of any mortgage payments. *In re Jug End in the Berkshires, Inc.,* 46 B.R. at 899. However, as the court in *R & H Investment Co., Inc.,* observed:

> [w]hen a debtor relies solely on the existence of an equity cushion to provide adequate protection to a secured creditor, the debtor assumes a heavy burden to overcome the creditor's assertion that the secured investment is at risk ... the debtor's burden is to show not only that the market value of the property, less costs of sale and tax encumberances, is greater than the steadily increasing amount of [the secured party's] debt; but also that it is greater by a margin sufficient to ensure that [the secured party's] interest is not at risk.

46 B.R. at 116 (citations omitted, footnotes omitted.)

In contrast, other courts have held that the mere existence of an equity cushion cannot be held to constitute adequate protection. *Matter of Embrey,* 56 B.R. 626, 628 (Bankr.W.D.Mo.1986); *Matter of Lipply,* 56 B.R. 524, 527 (Bankr.N.D.Ind.1986). They recognize that an equity cushion, as a means of providing adequate protection through the 'indubital equivalent' standard, is intended to protect against the depreciation of the property during the pendency of the bankruptcy case. However, in the wake of the *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984), decision and its progeny, *see, e.g., Grundy National Bank v. Tandem Mining Corporation,* 754 F.2d 1436 (4th Cir.1985); *In re Martin,* 761 F.2d 472 (8th Cir.1985), they also recognize the need, if not the necessity, of providing compensation for the "lost opportunity" interest of the secured creditor occasioned by the delay in enforcement of its rights as a result of the bankruptcy proceeding.

> It is plain that 'adequate protection must be completely compensatory; .. a creditor ... wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders unless by a substitute of the most *indubitable equivalence.*
> 75 F.2d at 942 (emphasis supplied).

---

**3.** The phrase indubital equivalent is derived from Judge Learned Hand's decision in *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935). In the context of a case involving the confirmation of a plan of reorganization proposed by a debtor over the dissent of a secured creditor, he stated:

A recent Eighth Circuit Court of Appeals decision, *In re Briggs Transportation Co.*, 780 F.2d 1339 (8th Cir.1985), reverses the trend toward requiring the payment of interest on secured claims in all cases as adequate protection. That case establishes that the lost opportunity cost is not an invarient element of adequate protection and holds that the right to receive interest on a secured claim is an equitable right rather than an absolute entitlement. The specific issue before the court in *Briggs* was not how to provide adequate protection but "what aggregation of creditor interests are entitled to protection when a bankruptcy court has determined that the automatic stay should be retained rather than lifted." 780 F.2d at 1342. In its opinion, the court determined that:

> The bankruptcy code's design, the legislative compromises from which the statute was constructed, and the developing case law all indicate that the creditor rights to be afforded adequate protection in a given situation depend on a variety of factors the exact character of which will vary from case to case and may, but will not always, include the payment of interest for opportunity costs.

780 F.2d at 1346. Thus, according to the Eighth Circuit, although "creditors have no right to be placed in the same economic position as if there had been no bankruptcy filing," 780 F.2d at 1346–47, adequate protection creates a flexible standard requiring a balancing of interests between debtors and creditors. Such factors as the reduction in the value of the property caused by the delay imposed by the automatic stay and the financial loss to the secured creditor occasioned by the delayed realization on the value of the property overtime should be considered as well as the overall circumstances of the parties. Such an analysis necessarily entails a review of the pre-bankruptcy and postpetition relationship of the parties. R. Nimmer and P. Krauthaus, "Adequate Protection and Secured Claims," *Norton Bankruptcy Law Adviser* No. 5, at 4 (May 1986).

Accordingly, in determining whether interest in some form should be provided, the court should consider *inter alia* the following factors:

> (1) the length of delay on foreclosure that is predictable or has already occurred; (2) the debtor's purpose in attempting to retain the collateral including the extent to which it is speculating on an increase in collateral value; (3) the character of the proposed use and the degree to which it entails special risks of sudden value loss; (4) the size of the debt or secured claim; and (5) the degree of likelihood of successful reorganization with or without a requirement of periodic payment.

*Id.* at 4. *See also*, 780 F.2d 1349.

In contrast, the court in *In re Timbers of Inwood Forest Associates, Ltd*, 793 F.2d 1380, 1384 (5th Cir.1986), unequivocally ruled that an undersecured creditor is not entitled to postpetition interest payment. The court articulated the issue before it as follows: "Does 'adequate protection' under § 362(d)(1) contemplate that an undersecured creditor will receive postpetition interest periodically in cash or some other form to compensate it for 'lost opportunity' when its rights to foreclose is temporarily suspended by the automatic stay?" *Id.* at 1384. In a lengthy opinion, the court declined to follow the *In re Mariner Industries, Inc.* case ("*American Mariner* is marked by logical inconsistencies.... 793 F.2d at 1416) and criticized the *In re Brigg's* decision ( [T]he "opinion" gives the bankruptcy courts very little guidance and will likely require several years of litigation at the bankruptcy and appellate court levels before parameters of the rule announced in *Briggs* become clear." *Id.*) It concluded that the indubital equivalent language of section 361(3) does not entitle undersecured creditors to periodic postpetition interest payments as compensation for lost opportunity costs, noting that opportunity cost payments are "simply postpetition interest payments in sheep's clothing...." 793 F.2d at 1382 n. 1.

Thus, resolution of the adequate protection issue not only turns upon the Court's

determination of the fair market value of the Debtor's property but also upon what interests are required to be protected by the Court, a determination that depends, at least according to the Eighth Circuit, on the facts and circumstances of the case. The Court notes that there is a serious split of authority on the issue of whether lost opportunity costs are compensable. Furthermore, the Court notes that, at least with respect to the Fifth Circuit's opinion, the issue involved an undersecured creditor which is simply not the case here. As the Court is not bound by either of these decisions and as the issue of compensation for lost opportunity costs may well require resolution by the United States Supreme Court, this Court will not attempt to definitively resolve the issue, particularly where, as here, the creditor is oversecured.[4] However, for purposes of this opinion, the Court will utilize the factors outlined by the court in *In re Briggs.*

In determining fair market value, " 'the court can only endeavor to make a reasonable estimate of value based upon expert testimony presented to it in court.' " *In re R&H Investment Co., Inc.,* 46 B.R. at 116. Furthermore, "[n]o property value, as determined by appraisal, rests on scientific analysis." *In re Jug End in the Berkshires, Inc.,* 46 B.R. at 900; *In re Mikole Developers, Inc.,* 14 B.R. 524 (Bankr.E.D. Pa.1981). The educated opinions of the experts provide guidance for, but do not bind, the court. *In re Jug End in the Berkshires, Inc.,* 46 B.R. at 900; *In re Development, Inc.,* 36 B.R. 998 (Bankr.D. Hawaii 1984).

At the prior trial, Yankee Bank called four witnesses in support of its motion: William F. Curley ("Curley"), an appraiser with 30 years experience in the real estate business; Peter Pangore ("Pangore"), a registered architect with over 25 years experience; Peter Keim, ("Keim") a manage-

ment consultant employed by Laventhal & Horwath ("L & H") and Keerd. Keerd called Donald S. Welinsky ("Welinsky"), an experienced M.A.I. appraiser and Allen Baerenklau ("Baerenklau") of Baerenklau Associates, Inc., the management company in charge of the pre-opening operations of the Hotel, as witnesses and also testified in opposition to Yankee Bank's motion.

Curley testified that in his opinion the value of the Hotel, in its unfinished state, was $11,750,000. Curley used the reproduction cost method to value the Hotel. Although he stated that the comparable sales method of valuation was preferable, Curley indicated that no comparable sales data were available, a fact that Keerd's appraiser, Welinsky, did not dispute. Curley testified that he utilized the reproduction cost method of valuation because: 1) the Hotel was not producing income; 2) the income approach was unable to account for the distressed nature of the property; 3) no current or reliable income projections were available; and 4) the reproduction cost method was suitable for valuing special purpose properties such as the Hotel.

In reaching his estimate of value, Curley relied upon widely-used cost manuals. He first estimated the total cost of reproducing the Hotel new and then discounted that figure by 15%, his estimate of the state of the Hotel's incompleteness. Curley then subtracted approximately $2 million from his projection of what it would cost to "reproduce" the Hotel to account for the "hard costs" of construction necessary to complete it. Pangore's testimony was introduced to corroborate Curley's estimate of the "hard costs" necessary to complete the Hotel.

Welinsky testified that the best indicator of value was the income approach and that the cost of the Hotel to the developer was largely irrelevant to the prospective buyer

---

4. The Court notes, however, that decisions in this district support the Fifth Circuit view. For example, the decision in *In re Aegean Fare,* 34 B.R. 965 (Bankr.D.Mass.1983), a decision that preceded the Ninth Circuit's decision in *American Mariner,* recognized that "the clear weight of authority holds that adequate protection of an *undersecured* creditor's claim only contemplates protection against any decrease in value and does not require an additional increment for market interest on the value of the collateral." *Id.* at 969 (emphasis supplied).

assessing the likely return on his capital investment. Welinsky's opinion of the value of the Hotel, assuming that it was completed and ready to begin operations, was $19 million. That estimate then was reduced by $2,400,000 to account for construction costs to complete the Hotel, interest expenses, start-up management expenses and other administrative expenses to yield $16,600,000 as the final estimate of the Hotel's fair market value in its present state. Welinsky's opinion was predicated on projected income streams for the Hotel contained in a market study prepared by Keim in 1982 and updated in 1983, as well as a market study completed by Keim for a proposed 320 room Marriott Hotel to be located in a different quadrant of the same intersection as the Hotel.

Baerenklau testified that he prepared operating projections for the Hotel based upon actual room rates being charged in the Marlborough area and the actual expenses projected to be incurred by the Hotel. Although Baerenklau's projected income stream was slightly higher than the income stream projected by Keim in 1982, Welinsky testified that he used the more conservative projections as the basis for his estimate of value.

Keerd testified that the actual costs to complete the Hotel were likely to be $982,-518, in contrast to the $1,789,000 amount estimated by Pangore. The testimony of Baerenklau and Keerd was used by his counsel to explain and substantiate the $2.4 million figure used to reduce Welinsky's $19 million estimate.

The expert testimony of the professional appraisers produced market values that differed by $4,850,000. The Court notes that the dichotomy may be explained by the inherent limitations of the two valuation methods utilized. However, the testimony of both appraisers was seriously flawed in several respects, and these flaws consciously or unconsciously may have pushed the appraisers in the direction of the desired results. Curley included in his reproduction cost an ascribed land value equal to the acquisition cost of the Hotel property, which was purchased more than three years ago, without accounting for any appreciation in its value. Furthermore, Curley was unaware of the 1985 L & H study prepared by Keim for the proposed Marriott Hotel and erroneously assumed that the only available market study was the 1982 L & H study. As a consequence, he was unable to test the accuracy of his reproduction cost estimate against any other recognized valuation method. More significantly, Curley's estimate that the Hotel was 15% incomplete was little more than an educated guess and Pangore's estimate of the cost to complete the Hotel was based, at least in part, on early and incomplete specifications.

Likewise, Welinsky's opinion of the Hotel's value struck the Court as somewhat contrived in view of the fact that he had appraised the Hotel in 1984 at $15 million and in 1985 at $16.5 million. According to Welinsky, the $1.5 million increase between 1984 and 1985 was attributable to the elimination of the cost of a franchise fee. However, he made no adjustment for the possible concommitant decline in room occupancy levels because of the loss of affiliation with a widely known hotel chain. Wilensky testified that the reduction in interest rates was responsible for his decision to increase the value of the Hotel by $2.5 million between 1985 and 1986. Certain considerations were notably absent from his analysis, however. He did not include a discount factor for both the fact that the Hotel had been ambitiously and continuously marketed by Keerd without success for approximately nine months and the fact that the entire future of the Hotel project was cast in doubt by the filing of involuntary petitions against Keerd and VEK Corporation.

█ Taking into account the fact that both appraisals were completed in early June, 1986, that the Hotel has remained in an unfinished, nonoperational state for a considerable period of time since then, that the Curley appraisal should be adjusted upward to account for the deficiencies in his estimate of the building's incompleteness, and that the Welinsky appraisal

should be adjusted downward to account for the distressed nature of the property, the Court finds that the fair market value of the property is between $13.7 million and $14.7 million. As a consequence, there is an equity cushion of between approximately $1.2 million and $2.2 million.

■ The Court now must address the question of what constitutes adequate protection under the particular facts and circumstances of this proceeding. The Court cannot ignore the context of this case in light of its handling of the involuntary case filed in February against Cloverleaf, Keerd and VEK Corporation. Thus, while technically the Debtor has been in bankruptcy less than two months, the Debtor, but perhaps more accurately its principal, Keerd, has, in a loose sense, enjoyed the protection of the Bankruptcy Code for eight months, and neither the Debtor nor any related individual or entity has seen fit to propose payments to Yankee Bank since September of 1985.

Turning to the four factors enunciated by the court in *In re Briggs*, it is patently clear to the Court that an equity cushion alone is inadequate protection in the circumstances of this case and that, therefore, the Debtor has not carried its burden of proof on the issue of adequate protection.[5] Equity demands that Yankee Bank receive some additional protection in view of the size of the outstanding obligation and the length of time that has passed since Cloverleaf defaulted on that obligation.

Moreover, the Debtor averted foreclosure only by artful, arguably abusive, manipulation of the Bankruptcy Code. The purpose of the transfer of the Hotel to the Debtor on the eve of foreclosure, and the Debtor's subsequent attempt to retain the collateral is obvious from the report submitted to the Court on August 21, 1986 and the draft letter agreement presented to the Court at the September 3, 1986 hearing:

Keerd is attempting to protect his equity interest in Hotel. While the Court cannot condemn that individual's attempt to salvage his financial investment and personal stake in the Hotel, the Court finds that that intention, however worthwhile, cannot take precedence over all other legal and equitable concerns. The question really is, "who should pay for Keerd's extended endeavor to find a buyer for the Hotel property—the Debtor or its creditors?" Given that interest accrues at the rate of $5,833.19 per day to the serious deteriment of the junior secured and unsecured creditors, the Court finds that neither Yankee Bank nor the Debtor's other creditors should be obliged to underwrite Keerd's efforts. Rather, the Court finds that the Debtor was obligated to come forward with a meaningful offer of adequate protection. The Debtor's exclusive reliance on a rapidly eroding equity cushion is insufficient to protect Yankee Bank's financial interests.

Additionally, the Court notes that the likelihood of a successful reorganization in this case is slight. Yankee Bank promises to object strenuously to the impairment of its claim under any proposed plan of reorganization, and such an objection inevitably would protract the case, drastically increase expenses, undermine the position of junior lien holders and wreck havoc on the dividend to unsecured creditors. Thus, allowance of Yankee Bank's Motion for Relief from Stay under section 362(d)(1) is justified under the circumstances of the case.

Relief from stay under section 362(d)(2) may be granted even if there is an adequate equity cushion and the debtor is able to provide an alternative means of adequate protection. *In re Jug End in the Berkshires*, 46 B.R. at 900–01. For purposes of section 362(d)(1)(A), the majority of courts define equity as the difference

---

5. It is not the Court's function to propose a form of adequate protection different from that proposed by the Debtor. *In re Aegean Fare, Inc.*, 34 B.R. 965, 966–67 (Bankr.D.Mass.1983). However, the Court notes that even if section 361(3) precludes periodic postpetition interest pay-

ments as compensation for lost opportunity costs, protection might be provided by a guarantee or a bond from a third party not involved in the proceeding. *In re Timbers of Inwood Forest, Ltd.*, 793 F.2d at 1388.

between the property value and the total amount of liens against it. *Id.* at 901. Accordingly the existence of junior lienholders is relevant under section 362(d)(2). Applying this definition to the facts of this case, it is apparent that the Debtor has no equity in the property since the sum of Yankee Bank's lien and Tocci's mechanics lien exceed the fair market value of the property without even considering the number and amount of other liens and attachments, which the Debtor admits exist. Thus, the critical issue under section 362(d)(2) is whether the property is necessary for an effective reorganization.

■ To meet its burden of proving that the property is necessary to an effective reorganization, the Debtor must do more than merely assert as much. The Debtor must show that the property is "not only necessary to an effective reorganization but that an effective reorganization is possible and the property will contribute to it." *Id.*

■ Ironically, the legislative history of section 362(d) states:

"[t]his section is intended to solve the problem of real property mortgage foreclosures of property where the bankruptcy petition is filed on the eve of foreclosure. The section is not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even if the debtor has no equity if the property is necessary to an effective reorganization of the debtor."

124 Cong.Rec. H11092, H11093 daily ed. (September 28, 1978). Here the Hotel was transferred to the Debtor on the very eve of Yankee Bank's foreclosure sale. Nevertheless, the Debtor seriously maintains that the property is necessary to its effective reorganization. Although the Court cannot ignore the fact that Keerd apparently has procured a potential buyer and, indeed, that the Debtor has recently filed a Joint

Plan of Reorganization for Park West Hotel Corporation and VEK Corporation, the Court is not persuaded that this property is necessary for the Debtor's effective reorganization. Although the Debtor has been incorporated since 1984 and has been engaged in the pre-opening management of the Hotel, it never has operated the Hotel because the Hotel, in fact, is not operational. It is neither open to the public nor producing income. Significantly, there has been no suggestion that, absent the pending foreclosure by Yankee Bank, the beneficiaries of Cloverleaf intended to transfer the Hotel property to Park West Hotel Corporation. Under these circumstances, the Court finds there is sufficient reason to grant Yankee Bank's Motion for Relief from Stay under section 362(d)(2) as well as under section 362(d)(1).

### CONCLUSION

Yankee Bank is granted the relief it seeks. It now may proceed to dispose of the Hotel property through a foreclosure sale, if it so chooses. Consequently, the Court will not act upon its Motion to Dismiss, leaving the issues raised by that motion for another day. The Court notes that this disposition of Yankee Bank's August 1, 1986 pleading allows the Debtor and its unsecured creditors to assess whether a continuation in bankruptcy is in their best interests.

In view of the foregoing, the entire record of the case and the arguments of counsel, whether or not specifically mentioned herein, Yankee Bank's Motion for Relief from Stay is hereby allowed and its Motion to Dismiss is denied without prejudice.