**In re NORTH CARVER PINE CORPORATION, Debtor.**

**Bankruptcy No. 86–11399–JNG.**

United States Bankruptcy Court,
D. Massachusetts.

Jan. 29, 1987.

Christopher W. Parker, Craig & McCauley, Boston, Mass., for movant.

Steven J. Marullo and Gary W. Cruikshank, Marullo & Barnes, Boston, Mass., for respondent.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

North Carver Pine Corporation ("North Carver" or the "Debtor") filed a Chapter 11 petition on September 30, 1986.  Almost

immediately thereafter, on October 3, 1986, South Shore Bank ("South Shore" or the "Bank") filed a Motion for Relief from the Automatic Stay. South Shore holds valid and perfected security interests in virtually all of the Debtor's real and personal property.[1] The Debtor does not contest the validity of the Bank's interests. The Court conducted a trial on the Bank's Motion, which trial commenced on October 30, 1986 and concluded on December 1, 1986.

The Debtor operates a sawmill located on Plymouth Street in North Carver, Massachusetts. It owns the property, approximately six acres of land on the north side of the street, upon which the sawmill is located. It also owns approximately 20 acres of land on the south side of Plymouth Street. A lumber storage building, an office building, a planermill building and a small shed are located on the larger parcel on the south side of the street. The Debtor leases the land and the buildings on that side of the street to its affiliate,[2] Sharon Box & Lumber Company ("Sharon Box"). The lease between the Debtor and Sharon Box provides for a rental period of five years, commencing January 1, 1986 and terminating on December 31, 1991. Monthly rental payments are based upon the monthly costs and expenses of the Debtor. The Debtor's projections of its income and expenses, which were introduced into evidence during the course of the trial, reveal that Sharon Box pays $8400 per month for the use of the land and buildings.

The Debtor obtains its inventory of logs from Sharon Box. The Debtor's projections reveal that the logs are obtained for no consideration since the cost of materials in the projections is zero. The Debtor saws the logs it obtains from Sharon Box into lumber. It then sells the lumber to Sharon Box, its only customer. Sharon Box is unconditionally obligated to make weekly payments of $12,000 to the Debtor for the logs cut for it by the Debtor. That monthly payment is not production related and, thus, it is immaterial whether the Debtor cuts one or 100,000 board-feet of lumber per week for Sharon Box.

The president of the Debtor, Edwin A. Whitworth ("Whitworth") testified that the Debtor's income is seasonally dependent—the winter months yield the lowest revenues for sawmills. However, the seasonal dependency would appear to be no longer relevant due to Sharon Box's unconditional obligation to pay $12,000 per week to the Debtor. With respect to the Debtor's overall financial position, Whitworth testified that the Debtor, whose year end is July 31st, experienced losses in 1984, 1985 and 1986 as follows:

1. Except to the extent of a replacement lien in the amount of $8,000, granted by the Debtor, with Court approval, as adequate protection for the use of up to $8,000 in cash collateral claimed by the Bank, the Bank does not possess a lien on the Debtor's post-petition accounts receivable.

2. The term "affiliate" has a special meaning under the Bankruptcy Code. It means:
(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
(C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or
(D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement....
11 U.S.C. § 101(2). The parties agree that Sharon Box is an affiliate of the Debtor. However, they do not specify the particular subsection of section 101(2) that best characterizes the relationship between the Debtor and Sharon Box.

| Year | Loss | Depreciation | Actual Cash Profit/Loss |
|---|---|---|---|
| 1984 | $ 7,436.00 | $147,927.00 | $ 140,581.00 |
| 1985 | $ 85,008.15 | $174,223.70 | $ 89,215.55 |
| 1986 | $118,316.89 | $108,925.00 | $ (9,391.89) |

Although Whitworth's testimony was confused, it is evident that the losses reflected amounts that had been deducted for depreciation and that when those amounts are accounted for, the Debtor can be said to have realized an operating profit for 1984 and 1985 and not significant cash losses.

With respect to the Debtor's post-petition income, the Debtor projected gross profits of $13,303 for the period ending October 31, 1986, $13,122 for the period ending November 30, 1986, $10,522 for the period ending December 31, 1986, and $8,103 for the period ending January 31, 1987. However, negative net cash flows were projected for each of these periods. The Debtor was only able to project positive net cash flows after the addition of rental income in the amount of $8400 per month from Sharon Box and income in the amount of $1000 per month from contract labor. Additionally, Whitworth's testimony demonstrated that the Debtor's projections were inaccurate in several respects. The projected interest expense and debt service expense failed to reflect interest and principal payments to the first mortgagee, Middleborough Trust Company. Furthermore, revenues were overstated. However, the Debtor, through Whitworth's testimony, was able to establish that labor and operating costs were less than the amounts projected, thereby mitigating the effects of the decreased revenues and increased interest and debt service expenses on the Debtor's projected income. Nevertheless, Whitworth admitted that the Debtor's projections were based upon higher production levels than those those actually achieved[3] and that, at least with respect to the Debtor's November projection, that ninety percent of the Debtor's profits was from rents, and the remaining ten percent was from operations.

Whitworth's testimony emphasized the Debtor's dependence upon Sharon Box. Kevin Moyer ("Moyer"), the president of that company, testified that he anticipated profitable operations for that company. Nevertheless, he admitted that Sharon Box was not currently meeting all of its obligations to all of its creditors; that Sharon Box was beyond its loan formula under its lending agreements with South Shore; that South Shore had called its loan with Sharon Box; that South Shore had asked Sharon Box to transfer its loan to another bank before December 31, 1986; and, most significantly, that Sharon Box had sustained and was continuing to sustain serious losses. Specifically, Sharon Box, according to Moyer, lost $124,000 during the first ten months of 1986 and $27,000 in the month of October, 1986. Moyer also testified that Sharon Box anticipated a loss of $20,000 in November of 1986.

South Shore's Credit Manager, Edward W. Gilman ("Gilman") testified that the total outstanding obligations of the Debtor to the Bank, as of October 30, 1986, exclusive of costs and attorneys' fees, was comprised of $2,682,446.50 in principal and $101,592.85 in interest, for a total of $2,784,039.35. He indicated that the known per diem interest rate on the Debtor's outstanding obligations to South Shore is approximately $117.40. In support of these figures, Gilman testified that the various obligations could be broken down as follows:

| Note/Date | Original Amount | Present Balance[4] |
|---|---|---|
| No. 104 (5/21/84) | $1,200,000.00 | $ 228,390.00 |
| A Note (7/14/83) | $1,600,000.00 | $1,521,745.12 |
| B Note (7/14/83) | $ 600,000.00 | $ 526,837.23 |
| C Note (7/14/83) | $ 140,000.00 | $ 128,000.00 |
| D Note (7/14/83) | $ 19,222.04 | $ 9,222.04 |
| No. 225 (11/3/83) | $ 42,000.00 | $ 25.12 |
| No. 42 (8/13/80) | (Revolving) | $ 229,000.00 |

3. The Court notes that, given Sharon Box's commitment to pay $12,000 per month regardless of production, projections based upon production are not particularly useful.

4. The Court notes that the total of the present balances of the notes is $2,646,446.40. The $36,000.10 discrepancy between that number and the total of the outstanding obligations used by Gilman was not explained.

619

| Note/Date | Accrued Interest | Per Diem |
|---|---|---|
| No. 104 (5/21/84) | $ 3,181.60 | $ 53.93 |
| A Note (7/14/83) | Unknown | Unknown |
| B Note (7/14/83) | Unknown | Unknown |
| C Note (7/14/83) | None | None |
| D Note (7/14/83) | 127.83 | $ 2.18 |
| No. 225 (11/3/83) | 25.12 | $ .76 |
| No. 42 (8/13/83) | $ 98,258.30 | $ 60.43 |

Both Gilman and Robert G. Cocks ("Cocks"), South Shore's Senior Vice President, indicated that the amount of interest on the A and B notes was based upon the Debtor's income and that for approximately 18 months before the filing of the bankruptcy petition South Shore had not received financial information from the Debtor from which it could calculate interest. Such information was required by the Basic Agreement, dated July 14, 1983, between the Debtor and Bank. In any event, the Debtor, in its post-trial memorandum, admits that the principal amount of its indebtedness to the Bank, as of September 18, 1986, is $2,450,194.39.

Gilman testified that South Shore made demand for payment to the Debtor in mid-September of 1986 and that the Debtor failed to respond. According to Cocks, South Shore had the right to make demand for payment of the notes at all times. A letter agreement, dated July 14, 1983, between Willard A. Rhodes ("Rhodes"), who at that time owned all the beneficial shares of the Debtor corporation, corroborated Cocks testimony. The letter agreement provides:

> You ... acknowledged that we have made no agreement with you to continue to extend credit to the Company, or to refrain from immediately demanding payment on the Credits *or any other obligations* of the [Debtor] Company and taking immediate steps to realize upon any or all collateral or guarantees held by us for the payment of such obligations.

(emphasis supplied).

Whitworth was the only witness that testified to the value of the Debtor's assets. He indicated that the real estate had a value of approximately $800,000. However, he also indicated that the property was subject to a mortgage in the amount of $183,503.63, a mortgage prior in time and right to the one held by South Shore. Accordingly, the value of property subject to South Shore's mortgage is approximately $616,000. Whitworth also testified that the personal property of the Debtor, its machinery and equipment, had a value of $379,002.90. Whitworth valued the Debtor's other collateral assets, its receivables and inventory, less precisely at approximately $70,000. Accordingly, in its post-trial memorandum, the Bank acknowledges that the value of the real and personal property in which it has a security interest is approximately $1,060,000, leaving the Bank with an unsecured claim against the Debtor of approximately $1,600,000.

The Debtor admits that it has no equity in the property. However, the Debtor asserts that the Bank is adequately protected because it is 1) making monthly payments of $1,763.76 to the Bank; 2) retaining insurance on all its assets claimed as security by the Bank; 3) offering the Bank a replacement lien on any new inventory, equipment or other assets purchased by the Debtor; and 4) providing the guarantee of Sharon Box with respect to sufficient revenues to render the Debtor a profitable business enterprise. Additionally, the Debtor notes that the Bank has attachments on the personal property of Rhodes who has guaranteed a portion of the Debtor's obligations to the Bank.

## CONCLUSIONS OF LAW

Section 362(d) of the Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing the court shall grant relief from the stay provided under subsection (a) of this section such as by terminating, annulling, modifying, or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d). Section 362(d) is phrased in the disjunctive. Therefore, the Bank need prevail on only one of the two alternative tests to obtain relief from stay. *In re Jug End in the Berkshires, Inc.*, 46 B.R. 892, 898 (Bankr.D.Mass.1985).

■ Section 362(g) provides that "(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues." 11 U.S.C. § 362(g). Since the Debtor has admitted it lacks equity in the property, the Court will focus on subsection (B) of section 362(d)(2). Pursuant to section 362(g), the Debtor has the burden of proof on the issue of whether the property is necessary for an effective reorganization. "To meet that burden, the debtor must do more than merely assert that the property is necessary for an effective reorganization." *Id.* at 902. In this jurisdiction, the debtor is required to show

not only that the property is necessary to an effective reorganization but that an effective reorganization is possible and the property will contribute to it. The debtor need not show that it has actually proposed a plan which is acceptable to its creditors. The debtor need only demonstrate a *reasonable probability* that it will be able to propose a plan for a successful reorganization within a reasonable time. A reasonable probability cannot be grounded solely on speculation, however, and a 'mere financial pipe dream' is insufficient to meet the requirements of § 362(d)(2).

*Id.* (emphasis supplied, footnote omitted), citing *In re Saypol*, 31 B.R. 796 (Bankr.S. D.N.Y.1983); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y.1982); *In re Dublin*

*Properties*, 12 B.R. 77 (Bankr.E.D.Pa.1981). *See also In re Park West Hotel Corp.*, 64 B.R. 1013, 1023 (Bank.D.Mass.1986).

■ The Debtor argues, citing Whitworth's testimony, that the property upon which the Bank seeks to foreclose is necessary for the Debtor to successfully reorganize. It asserts that if the Bank is allowed to foreclose there will be no property of the Debtor remaining upon which a reorganization could be based. The Court finds that this assertion is insufficient to meet the burden of proof imposed by section 362(g). The Debtor has failed to address the fact that its mainstay, Sharon Box, is in serious financial difficulties of its own and may not be able to underwrite the Debtor to the tune of approximately $56,400 per month much longer. As a consequence, the Court is inclined to view the Debtor's ability to achieve an effective reorganization as "a mere financial pipe dream."

Furthermore, the Debtor has failed to address the inevitable objection of South Shore to the impairment of its claim under any proposed plan of reorganization. As the Bank correctly notes, the Debtor is unlikely to achieve a successful reorganization because, with respect to each class of impaired claims at least 51% of the creditors who have at least two-thirds of the aggregate amount of claims against the Debtor must assent to any proposed plan of reorganization.[5] Since the Bank has an unsecured claim in excess of one and one half million dollars and since the Debtor's schedules reveal its unsecured claims total only $285,688.72, the Bank is in a position to oppose any plan that does not provide for the immediate release of its collateral, i.e., virtually all the Debtor's assets. As a consequence, the Debtor will never be able to obtain the required two-thirds in amount of allowed claims in a class of unsecured claims, in order to have a Chapter 11 plan confirmed without resort to the "cram

5. Section 1126 of the Bankruptcy Code provides in relevant part:

A class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

down" provisions of section 1129(b)(1).[6] Additionally, in view of the Debtor's strapped financial position and the magnitude of its obligations to the Bank, the Court notes that it likely would have difficulty finding that a plan was feasible, did not discriminate unfairly and was fair and equitable with respect to the Bank's secured claim. *Cf. In re Agawam Creative Marketing Associates, Inc.*, 63 B.R. 612 (Bankr.D.Mass.1986). Accordingly, the Court finds that South Shore has established its entitlement to relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code.

■ Although the Court need not address the issue of whether the Debtor has offered adequate protection to the Bank, the Court observes that it is not impressed with the Debtor's offer of adequate protection. As the Court recently stated, adequate protection "constitutes a legislative attempt to reconcile the competing interests of debtors, who need freedom from harassing creditors in order to effectuate reorganizations, and secured creditors, who are entitled to some measure of protection for their bargained for property interests." *In re Park West Hotel Corp.*, 64 B.R. 1013, 1017 (Bankr.D.Mass.1986). It is clear from the *Park West* opinion, that the Debtor could provide the Bank with cash payments to adequately protect collateral, such as machinery and equipment, depreciating at a steady rate, and a replacement lien for the use of cash collateral. Indeed, the Debtor has taken both such steps. However, the question remains, in view of the fact that the South Shore has a security interest in virtually all the Debtor's assets, real and personal, whether the $1,763.76 monthly payment and insurance coverage is sufficient to protect the Bank against any decline in value of its collateral. *See*

*In re Pullins*, 65 B.R. 560, 15 Bank.Ct.Dec. 178, 180 (Bankr.S.D.Ohio 1986).[7] The Debtor maintains that its real property is appreciating in value and that, although the machinery and equipment are depreciating, the proposed monthly payments are adequate. The Debtor introduced no evidence as to the annual rate of depreciation for the machinery and equipment, some of which is being used by Sharon box. Nor did the Debtor introduce any evidence as to the rate of appreciation for its real property, property which, parenthetically, has been used as a waste disposal site. As a consequence, the Court has no evidence as to the amount by which either the real or personal property is appreciating and/or depreciating, and, therefore, has no concrete basis for determining whether the proposed monthly payments are sufficient.

The Court is also unable to conclude that the other methods of adequate protection proposed by the Debtor in its post-trial memorandum are meaningful. For example, the guarantee of Sharon Box is, in the Court's opinion, virtually worthless in view of that company's tenuous economic position. Additionally, the Debtor cites no case to support its position that the Bank's attachments on the property of Rhodes somehow provide the Bank, in conjunction with the cash payments and insurance coverage, with the indubitable equivalent of its interest in the Debtor's property. *Cf* 11 U.S.C. § 361(3). Moreover, the Debtor failed to introduce evidence relative to the amount of the attachments and the nature of the property attached. In view of these deficiencies, the Court is unable to find that the Debtor has met its burden of proof on the issue of adequate protection. In other words, the Court cannot conclude that the monthly payment of $1,763.76 adequately

---

**6.** Subsection 1129(a)(8) of the Bankruptcy Code provides that "[w]ith respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). Subsection 1129(b)(1) further provides that the court shall confirm a plan notwithstanding the requirements of paragraph (8) if the "plan does not discriminate unfairly, and is fair and eq-

uitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." U.S.C. § 1129(b)(1).

**7.** The Court need not decide the issue of whether the Bank also is entitled to its "opportunity costs" caused by the delay in enforcing its lien rights against the Debtor's property.

protects the Bank against any decline in the value of its collateral.

In view of the foregoing, the memorandum and arguments of counsel, whether or not specifically mentioned herein, the Court hereby grants the Motion of South Shore Bank for Relief from Stay.